IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES ALLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-777-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

---

Steven L. Butler, Esquire of Linarducci & Butler, New Castle, Delaware.  Counsel for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, District of Delaware and Heather Benderson, Esquire, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Region III.  Of Counsel:  Eric P. Kressman, Esquire, Regional Chief Counsel and Sandra Romagnole, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania. Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated: May 𝟥𝟥, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

James Alley ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

Currently before the court are the parties' cross motions for summary judgment. (D.I. 13, 15)  Plaintiff seeks an award of benefits in his favor or, alternatively, a reversal and remand for further review.  For the reasons set forth below, plaintiff's motion will be granted and defendant's denied.  The decision of the Commissioner dated September 11, 2009 will be reversed, and this matter will be remanded for further findings and/or proceedings consistent with this opinion.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed his claim for DIB and SSI on November 16, 2006, alleging disability

---

[1]Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

since the amended onset date of September 8, 2006[2] due to lower back and left leg
pain. (D.I. 11 at 117, 123)  Plaintiff's applications were denied initially and on
reconsideration. (Id. at 71; 213-14)  On April 29, 2009, a hearing on plaintiff's claims
was held before an ALJ. (Id. at 21-47)  At the hearing, the ALJ heard testimony from
plaintiff and a vocational expert ("VE"). (Id. at 23, 40)

On September 11, 2009, the ALJ issued an unfavorable decision, finding plaintiff
not disabled and denying plaintiff's claim for DIB and SSI. (Id. at 10-20)  The ALJ found
that, while plaintiff could not perform his past work, he could perform a limited range of
light work available in the national economy.  Plaintiff appealed the ALJ's decision to
the Appeals Counsel, which declined to review the decision, making it a final decision
reviewable by this court. (Id. at 1-4)  Plaintiff filed the present action on September 13,
2010. (D.I. 1)

## B. Factual Background

### 1. Plaintiff's medical history, treatment and condition

Plaintiff[3] was born in 1965 and attended high school up to and including 11th
grade.[4] (D.I. 11 at 24, 242)  Plaintiff was 41 years old at the time that he stopped

---

[2]Although the onset date was amended at the administrative hearing and through
correspondence, the Administrative Law Judge ("ALJ") based her decision on the
original (incorrect) onset date. (D.I. 11 at 13, 25, 114)

[3]Plaintiff filed an application for DIB after undergoing a laminectomy in July 1998.
(D.I. 11 at 136-37)  Following the initial state agency denial, plaintiff returned to work.
(Id. at 144-47)  Plaintiff filed a second application for DIB in 2003, which was denied at
the reconsideration level. (Id. at 136-37)  Plaintiff returned to work until the alleged
onset date of September 8, 2006. (Id. at 25)

[4]Plaintiff's brief states that he is a high school graduate, yet the ALJ noted that
the documents of record reflected otherwise. (Id. at 24, 242)

3

working and is a younger individual under 20 C.F.R. §§ 404.1563(c), 416.963. (*Id.* at 114, 117) He was previously employed as a maintenance worker, for approximately 16 years at the same job at a farmers' market in Delaware. (*Id.* at 195-196) Plaintiff had polio as a child. (*Id.* at 256, 364, 380)

The record medical evidence reflects that plaintiff commenced treatment for back problems in 1998. Specifically, in July 1998, Michael G. Sugarman, M.D., a neurosurgeon, performed a lumbar L5-S1 diskectomy. (*Id.* at 263) Dr. Sugarman's notes reveal that plaintiff "did very well following his surgery up until" about sometime in 2005, when his back pain recurred. (*Id.*) Plaintiff described this pain as radiating from his back down into his left leg and into the middle of his foot. He also experienced intermittent numbness and tingling.

On September 15, 2006, Mohammed Kamali, M.D., an orthopedic specialist, examined[5] plaintiff and evaluated his complaints of left hip pain. (*Id.* at 260) Dr. Kamali observed "no visible abnormality" in the left hip and the "range of hip motion [was] almost full and only minimally painful." (*Id.*) Dr. Kamali noted that plaintiff walked very well with "no discernible limp." After comparing x-rays, Dr. Kamali found changes in plaintiff's hip due to Perthes disease.[6] He averred that if degenerative arthritis

---

[5]At the request of plaintiff's primary care physician Gregory Papa, D.O. (*Id.* at 260) Dr. Papa has treated plaintiff for approximately ten years.

[6]Apparently, plaintiff was diagnosed with this disease as a young child. (*Id.* at 260) Perthes is a rare disorder of the hip affecting young children between the ages of 4 and 10. Essentially, the blood supply to the femoral head is interrupted which weakens the bone. The bone is reabsorbed by the body which can lead to a complete collapse of the femoral head. Later in life, degenerative joint disease may develop. Johns Hopkins Orthopaedic Surgery, http://www.hopkinsortho.org/perthes_disease.html (April 23, 2012).

4

progressed, plaintiff might require hip replacement. Conservative treatment, including
anti-inflammatory medication and exercise, was ordered. Dr. Kamali observed that
plaintiff had an ongoing back problem and was under the care of Dr. Sugarman. A four
month follow-up appointment, including x-rays, was recommended.

Plaintiff returned to Dr. Sugarman[7] for an evaluation on November 3, 2006. (*Id.*
at 263) Dr. Sugarman observed that plaintiff experienced "pain in his back going down
into [his] left leg" extending to the inside of his foot. (*Id.*) Plaintiff complained of
intermittent numbness and tingling, as well as stiffness and discomfort in his back.
Although plaintiff took pain medication prescribed by Dr. Papa, the pain continued to
interrupt his night time sleep. Dr. Sugarman's notes also reflect that plaintiff
experienced pain, numbness and tingling in his left hand. Plaintiff indicated that an
EMG of this hand showed carpal tunnel syndrome.

After examining plaintiff and reviewing an MRI scan of the lumbosacral spine, Dr.
Sugarman opined that

it shows degenerative disc disease at L5-S1 where there is a narrowing
of the disc space and decreased signal on the T2 weighted images.
There is mild decreased signal at L-5 as well. There does appear
to be a slight residual/recurrent disc protrusion present more prominent
to the left at L5-S1.

(*Id.*) Dr. Sugarman recommended surgical intervention, a fusion at L5-S1. (*Id.* at 264)
He advised plaintiff to stop smoking cigarettes to increase the chances of a successful
surgery. Dr. Sugarman recommended a two month follow-up visit to assess plaintiff's

---

[7]Plaintiff's primary care physician Gregory Papa, D.O. requested the evaluation.
(*Id.*)

pain and progress with not smoking. In the meantime, Dr. Sugarman concluded that, considering plaintiff's pain level, doing anything other than a light duty position would be very difficult. (*Id.* at 264) .

On March 6, 2007, Dr. Sugarman examined plaintiff during a preoperative visit. (*Id.* at 302) After reviewing plaintiff's MRI "again," Dr. Sugarman questioned whether he had a "clinically significant left sided disc herniation at L4-5" that required the planned surgery (decompression and fusion of L5-SI). To investigate further, Dr. Sugarman scheduled a selective nerve root block at L4 (on the left side).

On March 9, 2007, Dr. Sugarman reviewed the results of the nerve root block injection with plaintiff. (*Id.* at 300) Plaintiff reported that his level of pain was greatly improved, "dropping him from a pain level of a 6 or 7 to a pain level of 2." (*Id.*) As a result, Dr. Sugarman told plaintiff that a fusion operation was unnecessary. Plaintiff agreed to continue the injections and scheduled a follow-up appointment to assess pain threshold in a month.

During a follow-up appointment with Dr. Sugarman on April 18, 2007, plaintiff stated that the injections were providing insufficient long term relief[8] and requested that surgery be scheduled. (*Id.* at 299) After discussing the risks of surgery, Dr. Sugarman scheduled a left L-4-5 microdiscectomy.

On May 10, 2007, Dr. Sugarman performed a "transforaminal left L4-L5 diskectomy." (*Id.* at 266) Dr. Sugarman described the surgery as successful. (*Id.* at 267)

---

[8]The injections provided only a few days of pain relief. (*Id.* at 299)

6

On June 12, 2007, plaintiff was evaluated post-operatively. (*Id.* at 298) Office
notes reflect that plaintiff continued to experience pain and symptoms. He described a
"tingling sensation" of the left lower extremity upon palpitation. His "gait was slightly
antalgic." (*Id.*) Plaintiff was instructed to continue his medication and return for a
follow-up appointment in two weeks.

On June 26, 2007, plaintiff was seen by Dr. Sugarman for a follow-up visit and to
review the results of his MRI scan. (*Id.* at 297) Plaintiff's complaints of left lower
extremity numbness, tingling and pain were noted. The MRI scan revealed
"osteophytes at L5-S1." He was prescribed a 12-day course of Prednisone to relieve
pain. A myleogram and post-myelogram CT scan were ordered; a follow-up
appointment was recommended.

Plaintiff was treated by Jie Zhu, M.D., a pain management specialist, on August
2, 2007.[9] (*Id.* at 333) Dr. Zhu's examination notes reflect that plaintiff presented with
complaints of chronic low back pain that had increased after lumbar surgery. (*Id.* at
332) Dr. Zhu prescribed pain medication, including a fentanyl patch and oxycodone.

On October 23, 2007, plaintiff was examined by Dr. Yong K. Kim, M.D.,[10] for a
consultative examination at the request of the state agency. (*Id.* at 270-280) Dr. Kim

---

[9]Plaintiff was under Dr. Zhu's care from August 2( (*Id.* at 311) Office notes reflect that plaintiff had difficult, bending and lifting in addition to his antalgic gait. (*Id.* at from a February 28, 2009 appointment reveal that plaintii relief from the medications prescribed by Dr. Zhu. (*Id.* at

[10]In her findings, the ALJ referred to Dr. Kim as "Di identification on the face of the medical evaluation. (See

*[handwritten: Sorry Judge— The ALJ called her Dr. Yong.]*

7

observed that plaintiff's gait "was abnormal showing mild antalgic gait favoring the left lower extremity." (*Id.* at 271) Dr. Kim's evaluation notes reflect that plaintiff said he felt better immediately after surgery. However, plaintiff said back pain, radiating to his left knee area, returned about three days following surgery. Plaintiff indicated that

> his walking [was] limited to two blocks at a time due to low back pain. Standing [was] limited to less than five minutes at a time due to low back pain. Sitting [was] limited to 15 minutes at a time due to low back pain. Lifting is limited to 15 lbs.

(*Id.*) Plaintiff also experienced pain in the left knee. Plaintiff averred that his low back pain was constant and measured at an 8/9 out of 10 on a pain scale. Dr. Kim opined that plaintiff's low back "pain" restricted him to walking, standing, and sitting for four to six hours in an eight hour day, and lifting between 15-20 pounds.[11] (*Id.* at 271)

In October 2007, Dr. M.H. Borek, M.D., a medical expert for the state agency, met with plaintiff and reviewed his medical records; Dr. Borek did not examine plaintiff. (*Id.* at 274-280) Dr. Borek noted that, during the evaluation, "plaintiff rocked the entire time, looked uncomfortable and disheveled, [his] hands shook a lot" and he had "difficulty with sitting, standing and walking." (*Id.* at 279) Dr. Borek opined that plaintiff had the Residual Functional Capacity ("RFC")[12] for a limited range of light work-related activity. (*Id.*)

On November 7, 2007, plaintiff returned to Dr. Sugarman with complaints of low back discomfort and pain traveling down his left leg then radiating to his knee. (*Id.* at

---

[11]Dr. Young also found that plaintiff had "limited in upper extremities" push and/or pull limitations. (D.I. 11 at 275)

[12]RFC is defined as that which an individual is still able to do despite the limitations caused by his impairments. 20 CFR §§ 404.1545(a), 416.945(a).

294) Upon examination, Dr. Sugarman observed plaintiff's "back had a limited range of motion secondary to stiffness and pain." Myelogram and post-myelogram CT scans showed "post-operative changes at L4-5 and L5-S1" and "neural foraminal narrowing and degenerative changes at both levels within the disc spaces." (Id.) Dr. Sugarman opined that plaintiff's symptoms emanated from the L4-S and L5-S1 levels and recommended a fusion at those levels. He explained the procedure to plaintiff and reviewed the associated risks. Dr. Sugarman also encouraged plaintiff to stop smoking.

On January 29, 2008, Dr. Papa[13] completed a RFC evaluation wherein he diagnosed plaintiff with advanced lumbar disc disease. (Id. at 281-283) He opined that, in an eight hour workday, plaintiff could not carry any weight for 2/3 of the day and only 5 lbs for the remaining 1/3 of the workday. (Id. at 281) Dr. Papa noted that plaintiff experienced side effects from the prescription medication that would moderately affect his ability to concentrate. He described plaintiff's pain as "severe" and an interference with his ability to complete an 8-hour workday. (Id. at 282) Dr. Papa observed that plaintiff suffered from depression. He concluded that plaintiff was unable to perform sedentary work on a regular basis. (Id. at 283)

On February 5, 2008, plaintiff was seen by Dr. Papa for a pre-operative examination. (Id. at 304) On February11, 2008, Dr. Sugarman performed a lumbar

---

[13]In a March 21, 2008, medical certification for public assistance, Dr. Papa opined that plaintiff was not able to perform any work on a full time basis. (Id. at 339) Dr. Papa reached the same conclusion in a medical certification for public assistance on October 9, 2008, adding that plaintiff had already had three surgeries and "needs hip replacement" due to polio. (Id. at 360)

9

fusion and decompression.[14] (*Id.* at 305-310) Operative notes reflect that there were no complications during surgery and plaintiff was taken to the recovery room in satisfactory condition. (*Id.* at 305, 309)

On April 4, 2008, Dr. Mohamed Ahmed examined plaintiff at the Pain Clinic at St. Francis Hospital. (*Id.* at 380) His office notes reveal that plaintiff's chief complaint was low back and leg pain. (*Id.* at 380-381) Plaintiff described the pain at a 7 on a scale of 0-10 and as "throbbing, stabbing, sharp pain, sometimes pressure like and aching, and associated with pins and needles." (*Id.* at 380) Despite taking 15 mg of oxycodone (up to four times a day), Lyrica 150 mg (twice a day) and having a fentanyl patch 50 mcg, plaintiff stated that his pain always returned. Plaintiff described feeling lightheaded from the fentanyl patches and wanted to discontinue use. Dr. Ahmed reviewed the radiological studies and noted:

> CT myelogram, which show[s] stable finding consistent with chronic partial left fasciotomy at L4-L5 with prominent postsurgical granulation tissue within the neural foramen encroaching on the existing left L4 nerve root. It also show[s] stable moderate degenerative diskogenic disease at L5-S1 with small disk bulge, posterior osteophyte, and osteoarthritic degenerative changes of the facet joints causing moderate stenosis of the neural foramen within the disk osteophyte complex abutting the anteroinferior aspect of the existing L5 nerve root.

(*Id.* at 381)

Dr. Ahmed increased plaintiff's Lyrica prescription to 200 mg (three times a day) and continued the course of oxycodone. The fentanyl patch was discontinued due to the adverse reaction of lightheadedness. Dr. Ahmed ordered a caudal epidural steroid

---

[14]A June 18, 2008 radiology report reflects that screws and rods were inserted at the L4-5 and L5-S1 levels during the operation. (*Id.* at 351)

injection with lysis of adhesions. (Id. at 381) On April 14, 2008, Dr. Ahmed administered the steroid injection to treat plaintiff's "failed back syndrome." (Id. at 379)

On May 6, 2008, plaintiff returned to Dr. Ahmed with complaints of pain. (Id. at 378) Plaintiff described his "pain as 8 on scale from 0 to 10." (Id.) Dr. Ahmed recommended a continuation of the medications (oxycodone and Lyrica).

On June 12, 2008, Dr. Ahmed treated plaintiff's complaints of pain. (Id. at 377) Plaintiff described his "pain today as an 8 on scale of 0 to 10." Dr. Ahmed advised plaintiff to continue medications and added methadone 5 mg twice daily.

On July 18, 2008, Anne C. Aldridge, M.D., a medical expert conferring for the state agency, reviewed plaintiff's medical records and agreed with Dr. Borek's previous assessment as written. (Id. at 355)

On July 23, 2008, Dr. T. Shane Palmer, a chiropractor, examined plaintiff. (Id. at 391) Dr. Palmer's office notes reflect that plaintiff appeared in pain and was recently involved in a motor vehicle accident on June 30, 2008. Plaintiff was the left seat rear passenger in a car struck from the rear. As a result, plaintiff experienced neck pain and was taken by ambulance to the hospital where he was prescribed pain medication and released. Dr. Palmer noted that plaintiff continued to experience neck pain and lower back pain that worsened with "sitting, standing, use, activities of daily living and bending, twisting and lifting." (Id.)

Dr. Palmer diagnosed[15] plaintiff with cervical disc displacement with cervical

radiculopathy and cervical somatic dysfunction. (*Id.* at 391) Dr. Palmer devised a

treatment plan to "reduce [plaitniff's] pain, reduce joint fixations," increase flexibility,

reduce inflamation and "strengthen the regional musculature." (*Id.*)

In a September 4, 2008 letter, Dr. Palmer responded to a request for a

Functional Capacity Evaluation ("FCE") relating to plaintiff's cervical pain. (*Id.* at 392)

After performing a series of tests, Dr. Palmer opined that

> plaintiff has residual moderate pain in the lower back, moderate
> stiffness in the lower back and mild lost range of motion in the
> lower back and it is my opinion that these symptoms will persist
> for the foreseeable future. Plaintiff's symptoms and physical
> findings are consistent with the type of injury he has sustained.

(*Id.* at 393) Dr. Palmer found a 20% whole person impairment and opined that plaintiff

could not return to his previous job. Dr. Palmer recommended that plaintiff instead

obtain vocational retraining to learn a new trade or skill which would not exacerbate his

condition. (*Id.* at 393)

On December 16, 2008, plaintiff returned to Dr. Sugarman with complaints of

numbness, pain and pain in the back of the neck. (*Id.* at 401) An MRI showed a right

sided disc protrusion at C4-5, which was consistent with plaintiff's symptoms. Dr.

Sugarman recommended "selective nerve root block at the C4-5 level on the right" and,

if plaintiff improved, then "he would be a good candidate for surgical intervention." (*Id.*)

---

[15]Dr. Palmer listed three additional diagnosis: (1) occipital somatic dysfunction
with cephalalgia and myospasm; (2) thoracic somatic dysfunction with thoracic sprain
strain and myospasm; and (3) lumbar disc displacement with lumbar sprain strain and
lumbalgia. (*Id.* at 391)

12

In February 2009, Dr. Sugarman wrote Dr. Papa to advise that plaintiff's most recent MRI results indicated that the C4-5 defect was not visible and, as a result, Dr. Sugarman no longer recommended surgery. (*Id.* at 417) Dr. Sugarman wrote that plaintiff's "symptoms were more related to cervical spondylosis than anything else." (*Id.*)

On February 3, 2009, Dr. Sugarman completed a Social Security Disability Evaluation. (*Id.* at 399) Dr. Sugarman wrote that during a workday plaintiff could not bend, turn/twist, kneel, squat, crawl or climb. Dr. Sugarman concluded that plaintiff's functional limitations meant that he would not be able to work a 40 hour work week. (*Id.* at 399)

On February 4, 2009, Seth L. Ivins, M.D., a pain management physician, examined plaintiff. (*Id.* at 411) In completing a RFC evaluation form, Dr. Ivins opined that plaintiff suffered with severe pain and took medication that would preclude him from performing even sedentary work for a 40 hour work week. (*Id.* at 407-409) Dr. Ivins observed that plaintiff suffered from depression, which would affect his physical problems. (*Id.* at 408)

On June 3, 2009, plaintiff was examined by Brian L. Brice, M.D., a rehabilitation specialist, to obtain a consultative disability report. (*Id.* at 426) After examining plaintiff, Dr. Brice found that the "lumbosacral range of motion is significantly impaired due to pain in all planes." (*Id.*) Dr. Brice reviewed plaintiff's EMG testing and concluded that he was precluded from full work activity. (*Id.* at 427) Dr. Brice wrote that plaintiff's limitations were due to inadequately controlled pain. He found significantly impaired

13

range of motion ("ROM") on lumber spine, low back tenderness, 4-/5 left knee extension, and impaired sensation to light touch and pinprick along the left L4-5 dermatome distribution. (*Id.* at 426-427) He concluded that plaintiff was unable to work full-time as either a laborer or in a sedentary work environment. Dr. Brice noted that plaintiff's impairments would impede adequate performance and that plaintiff did not have adequate pain relief. (*Id.* at 427)

### 3. The administrative hearing

#### a. Plaintiff's testimony

A hearing was held before the ALJ on April 29, 2009. (*Id.* at 21-47) Plaintiff, 43 years of age at the time, was represented by counsel and testified at the hearing. Plaintiff testified at length about his physical ailments. Prior to doing so, however, the ALJ asked plaintiff about his work history. From 1986 - 2001, plaintiff worked as a maintenance worker at a farmers' market in Delaware. (*Id.* at 25-26) His responsibilities included sweeping floors, cleaning bathrooms, changing light bulbs, taking care of anything electrical, upkeep of the lot and emptying the garbage.

Plaintiff testified that since 2001, he has experienced back pain and problems with his back "going out." (*Id.* at 26) He has had three separate back surgeries performed. (*Id.* at 26-27, 34) Plaintiff denied any other health problems, except carpal tunnel in his left hand. (*Id.* at 28, 44) He explained that his hands often lock-up, causing him to drop things. (*Id.* at 44)

He stopped working at the farmers' market due to severe back pain and has not worked since May 1, 2004. (*Id.* at 27) He has had difficulty securing new employment.

14

Plaintiff did try working at a mulching company in New Jersey, but had to stop after about a week due to difficulty in lifting 50 lbs; his back would lock-up and he felt "paralyzed." (*Id.* at 27) Since his last back surgery (fusion), his pain has decreased, but is still present. (*Id.* at 38-39)

Plaintiff has continued looking for employment, "just going around looking for jobs, like at McDonald's, anything, because [he] just needed the money." (*Id.* at 28) When plaintiff discloses his back problems, he has been denied employment because the employers "kept telling [him] that their insurance is at a high risk . . . [and] just wouldn't cover [him]." (*Id.*) When plaintiff did not disclose his back problems and was hired, he was unable to perform the job because he was "hunched over." (*Id.*)

At the time of the hearing, plaintiff lived in a rented room owned by his girlfriend's mother. (*Id.* at 24) His source of income was food stamps and cash assistance. He helped with some chores, including folding laundry and vacuuming. Plaintiff accomplished grocery shopping by making several trips during the week.

Plaintiff testified to spending about 90% of his day laying down because this position relieved the pressure on his back. He cannot lay down or sit all day, however, because his back stiffens and throbs. (*Id.* at 30) He has a driver's license, but his girlfriend did most of the driving. He occasionally visited a niece, about eight miles from his home. (*Id.* at 31) He did not attend church or socialize with family, friends or neighbors; most free time was spent watching television. (*Id.* at 30-31)

Plaintiff was in a motor vehicle accident on June 30, 2008, resulting in cervical spine injuries. (*Id.* at 35) No MRI testing was done because of the rods and screws

15

inserted during the fusion surgery. He testified that there was no change in his back problems due to the motor vehicle accident.

Plaintiff testified to taking several different pain medications: (1) amitriptyline for sleep; (2) Avinza for pain; (3) Neurontin for nerves; (4) oxycodone for pain; and (5) Cymbalta for pain. (*Id.* at 31, ex.12E) Plaintiff explained the pain medications are helpful but only effective for about three hours and then the pain returns. (*Id.* at 32) Constipation was the only adverse affect of the medication. He smoked about one-half to three-quarters of a pack of cigarettes a day. (*Id.* at 31)

### b. VE's testimony

Following plaintiff's testimony, the ALJ consulted VE Jenkins. (*Id.* at 40) The VE classified plaintiff's prior relevant work (maintenance worker) as semi skilled and of a medium exertional level. The VE identified no transferable skills from this work history.

The ALJ then asked the VE to consider several hypothetical questions. The first hypothetical, asked by the ALJ, was as follows:

I'm going to ask you to consider a hypothetical individual who is 43 years old. (inaudible) limited education, but able to read, write, and use numbers. (Inaudible). Able to read, write, and use numbers; past work history that you described; and the following restrictions: able to lift and carry [10] pounds frequently, [20] pounds occasionally; able to stand and walk in excess of four hours a day but less than six, able to sit for six hours a day, for a combined total of eight hours in a given workday; able to balance, stoop, crouch, crawl, squat, and kneel occasionally; to climb stairs occasionally; no ladders or scaffolds; no dangerous heights; no dangerous machinery; should avoid concentrated exposure to cold and vibrations; can occasionally handle and finger. Would there be jobs in significant numbers in the national and regional – I would say, can understand, remember, and carry out detailed instructions adequately. Would there be jobs in significant numbers in the national and regional economy that the hypothetical individual could do.

16

(*Id.* at 41) In response, the VE explained that this hypothetical individual could find

work at the light exertional level with a sit/stand option as a cashier, copier operator,

and a nonpostal mail sorter. (*Id.* at 41-43) Plaintiff's attorney did not question the VE.

### 4. The ALJ's Findings

The ALJ issued the following findings:

1. The claimant met the insured status requirements of the Social
Security Act on December 31, 2010.

2. The claimant did not engage in substantial gainful activity during
the period from her alleged onset date of May 1, 2004 (20 CFR 404.1571
and 416.971 *et seq.*).

3. The claimant had the following severe impairments: L5 back surgery
due to bulging and herniated disc and left leg problem (20 CFR 404.1520(c)
and 416.920(c)).

4. The claimant did not have an impairment or combination of impairments
that met or medically equaled one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526,
416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds
that, the claimant has the residual functional capacity to perform light
work as defined in 20 CFR 404.1567(b) and 416.967(b) except the
claimant is able to stand and/or walk in excess of two hours in an eight-
hour workday and sit for six hours in an eight-hour workday. He can
occasionally stoop and handle. The claimant cannot work at dangerous
heights or with dangerous machinery and must avoid concentrated
exposure to cold and vibration. He is able to understand, remember,
or carry out detailed instructions and he is able to read, write and
use numbers.

6. The claimant was unable to perform any past relevant work
(20 CFR 404.1565 and 416.965).

7. The claimant was born May 4, 1965 and was 38 years old,
which is defined as a younger individual age 18-44, on the alleged
disability onset date (20 CFR 404.1563 and 416.963).

17

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability as defined in the Social Security Act, at any time from May 1, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 11 at 15-20)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive, if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

"substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806

F.2d 1185, 1190 (3rd Cir. 1986). In making this determination, a reviewing court may

not undertake a de novo review of the ALJ's decision and may not re-weigh the

evidence of record. *See id.* In other words, even if the reviewing court would have

decided the case differently, the ALJ's decision must be affirmed if it is supported by

substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the

evidence, but more than a mere scintilla of evidence. As the United States Supreme

18

Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56.  The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted).  Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ]ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3rd Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir. 1983)).  Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for

19

rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3rd Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(I), 416.920(a)(4) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

21

If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ

must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether ALJ's Decision is Supported by Substantial Evidence

In his motion, plaintiff contends that the ALJ's decision is not supported by substantial evidence. (D.I. 14) Specifically, plaintiff contends that the ALJ's findings are deficient for the following reasons: (1) the hypothetical question posed by the ALJ to the VE was defective; (2) the ALJ evaluated the medical evidence incorrectly; (3) the ALJ relied on an outdated non-examining state agency opinion; (4) the ALJ did not give appropriate deference to the opinions of plaintiff's treating physicians; (5) the ALJ disregarded the Commissioner's rulings; and (6) the ALJ failed to find plaintiff's carpal tunnel syndrome and cervical impairment severe. (D.I. 14, 17)

### 1. Hypothetical question

As the Third Circuit explained in *Podedwony v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984):

Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.

Reliance on an expert's answer to a hypothetical question will not constitute substantial evidence unless all credibly established limitations are included; remand is required

23

where the hypothetical question is deficient. *Id*; *Rutherford v. Barnhart*, 399 F.3d 546,

554 (3rd Cir. 2005). A hypothetical question must reflect all of a claimant's impairments

that are supported by the record; otherwise the question is deficient and the expert's

answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829

F.2d 1269, 1276 (3d Cir. 1987).

Third Circuit case law and governing regulations have provided guidance on

whether a limitation is "credibly established:"

> [First, l]imitations that are medically supported and otherwise uncontroverted
> in the record, but that are not included in the hypothetical question posed to
> the expert, preclude reliance on the expert's response. [Second, and
> r]elatedly, the ALJ may not substitute his or her own expertise to refute such
> record evidence. [Third, l]imitations that are medically supported but are also
> contradicted by other evidence in the record may or may not be found
> credible—the ALJ can choose to credit portions of the existing evidence but
> cannot reject evidence for no reason or for the wrong reason. Finally,
> limitations that are asserted by the claimant but that lack objective medical
> support may possibly be considered nonetheless credible. In that respect the
> ALJ can reject such a limitation if there is conflicting evidence in the record,
> but should not reject a claimed symptom that is related to an impairment and
> is consistent with the medical record simply because there is no objective
> medical evidence to support it.

*Rutherford*, 399 F.3d at 554.

At bar, the ALJ determined that plaintiff had the RFC to perform light work except

that he is "able to stand and/or walk in excess of two hours in an eight-hour workday

and sit for six hours in an eight-hour workday." (D.I. 11 at 16 ¶5) The hypothetical

posed to the VE did not include the same RFC finding that the ALJ made at step five.

Instead, the ALJ asked the VE to consider that the individual was "able to stand and

walk in excess of four hours a day but less than six, able to sit for six hours a day, for a

combined total of eight hours in a given workday." (D.I. 11 at 41) Although defendant

24

argues that the ALJ's finding is less restrictive than the hypothetical RFC, it is evident to the court that the ALJ did not include in this hypothetical question the limitations imposed by the ALJ's own findings. Given this ambiguity and the Third Circuit's mandate to include everything in a hypothetical based on RFC, remand is appropriate.

## 2. Evaluation of medical opinions

When an ALJ accepts the opinion of the non-examining state agency physician, the ALJ is required to include the functional limitations identified by that source in the RFC finding and hypothetical question. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). Further, the ALJ explicitly must weigh all relevant, probative and available evidence and provide some explanation for the rejection of probative evidence that would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir.1994) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3rd Cir. 1979) and *Brewster v. Heckler*, 786 F.2d 581, 584 (3rd Cir. 1986)). Conclusory statements are beyond meaningful judicial review. *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 119 (3rd Cir. 2000). An ALJ's decision must be accompanied by a clear and satisfactory explanation of the basis on which it rests in order for this court to properly decide whether the ALJ's decision is based upon substantial evidence. *Cotter v. Harris*, 642 F.2d 700, 704-05 (3rd Cir. 1981).

In considering the medical opinion evidence at bar, the ALJ found that the objective findings of Drs. Papa, Sugarman, Palmer and Brice did not support the degree of limitation assigned by these physicians. (*Id.* at 18-19) Rather, she gave "great weight" to the state agency medical consultants (Dr. Kim and the state agency

opinions) that found plaintiff capable of light work. (*Id.* at 19)   The record reflects that the ALJ's hypothetical question did not include push/pull limitations with upper extremities and the RFC finding does not include the limitations she credited. Accordingly, remand on this issue appropriate.

Similarly, the ALJ's reliance on the non-examining state agency source opinions is flawed because those opinions were rendered on an incomplete and out-dated record.  Specifically, the opinions of Drs. Kim and Borek were rendered in October 2007, prior to plaintiff's back fusion surgery.  Most of the medical exhibits had not been submitted into the record at the time the state agency physicians offered their opinions. The court finds remand is appropriate for a more comprehensive evaluation.[16]

## V. CONCLUSION

For the reasons discussed above, the court remands the case for further proceedings consistent with this memorandum opinion.  Plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied.  An appropriate order shall issue.

---

[16]In light of the court's findings, it is unnecessary to address plaintiff's remaining arguments.

26